**ERICA K. ZUNKEL**
California State Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467/Fax: (619) 687-2666
E-Mail: erica_zunkel@fd.org

Attorneys for Mr. Bernal

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**STEVEN PATRICK BERNAL (2)**,<br><br>Defendant. | ) | Case No. 08CR1894-WQH<br><br>DATE: July 21, 2008<br>TIME: 2:00 p.m.<br><br>NOTICE OF MOTIONS AND MOTIONS:<br><br>(1) TO COMPEL DISCOVERY AND PRESERVE EVIDENCE;<br>(2) TO SUPPRESS EVIDENCE;<br>(3) PRESERVE AND RE-WEIGH NARCOTICS EVIDENCE;<br>(4) COMPEL PRODUCTION OF GRAND JURY TRANSCRIPTS AND DISMISS INDICTMENT;<br>(5) DISMISS INDICTMENT BECAUSE DRUG STATUTE IS UNCONSTITUTIONAL; AND<br>(6) TO GRANT LEAVE TO FILE FURTHER MOTIONS. |

TO: KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
PAUL S. COOK, ASSISTANT UNITED STATES ATTORNEY:

PLEASE TAKE NOTICE that on July 21, 2008 at 2:00 p.m., or as soon thereafter as counsel may be heard, the defendant, Steven Patrick Bernal, by and through his counsel, Erica K. Zunkel, and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

/ / /

**MOTIONS**

The defendant, Steven Patrick Bernal, by and through his attorneys, Erica K. Zunkel, and Federal Defenders of San Diego, Inc., pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby moves this Court for an order to:

1) Compel discovery and preserve evidence;
2) Suppress statements;
3) Preserve and re-weigh evidence;
4) Compel production of grand jury transcripts and dismiss the indictment;
5) Dismiss indictment because the drug statutes are unconstitutional; and
6) Grant leave to file further motions.

These motions are based upon the instant motions and notice of motions, the attached statement of facts and memorandum of points and authorities, and all other materials that may come to this Court's attention at the time of the hearing on these motions.

Respectfully submitted,

DATED: July 14, 2008

/s/ Erica K. Zunkel
**ERICA K. ZUNKEL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Bernal

**ERICA K. ZUNKEL**
California State Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467/Fax: (619) 687-2666
E-Mail: erica_zunkel@fd.org

Attorneys for Mr. Bernal

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**STEVEN PATRICK BERNAL (2)**,<br><br>Defendant. | ) | Case No. 08CR1894-WQH<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS |

**I.**

**STATEMENT OF FACTS**[1]

On May 26, 2008, at approximately 7:15 p.m., Allan Ray West drove a 1995 Ford F-150 to the Calexico West Port of Entry. Mr. Bernal was the passenger. During pre-primary inspection, Customs and Border Protection Officer Cardenas questioned Mr. West about the vehicle, boat, and his stay in Mexico. Mr. West stated he was the registered owner of the truck, but the boat belonged to a friend. While Officer Cardenas was questioning Mr. West, CBP Officer Ragsdale was screening the vehicle with his Narcotics Detector Dog ("NDD") Rita. Rita subsequently alerted to the floor of the boat. At this time, Officer Cardenas arrested Mr. West and Mr. Bernal and escorted them to

[1] Unless otherwise stated, the "facts" referenced in these papers come from government-produced discovery that the defense continues to investigate. Mr. Bernal does not admit the accuracy of this information and reserves the right to challenge it at any time.

the secondary office. Further inspection revealed approximately 132 kilograms of marijuana concealed in non-factory compartments in the floor of the boat.

At approximately 10:16 a.m., Special Agents Dotson and Henderson interviewed Mr. West. After the Miranda advisals, Mr. West told agents that the only thing he wanted to say was that Mr. Bernal did not know. Other than that, he said, he wanted to "plead the Fifth" until an attorney was present. He stated this multiple times. In spite of a clear invocation of his right to remain silent, Agent Dotson continued to interrogate Mr. West. In the midst of this, Mr. West continued to state that Mr. Bernal did not know anything and that he did not tell Mr. Bernal anything about the marijuana in the boat.

After his interview of Mr. West, Special Agent Dotson proceeded to interview Mr. Bernal. At approximately 10:23 p.m., he advised Mr. Bernal of his Miranda rights. A transcript of the relevant advisals is attached as Exhibit A.[2] After the advisals, Mr. Bernal made limited statements and then emphatically told Agent Dotson multiple times that he wished to remain silent. In spite of these requests, Agent Dotson kept trying to interrogate Mr. Bernal and get him to incriminate himself by saying things such as, "it starts to get complicated now," in response to Mr. Bernal's request to remain silent. Mr. Bernal made statements in response to these coercive tactics that the government may try to use against him at trial.

The government has charged Mr. West and Mr. Bernal by way of indictment with importation of marijuana and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 951, 960. Mr. Bernal has pled not guilty to all counts and charges. These motions follow.

## II.

## MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE

Mr. Bernal requests the following discovery. His request is not limited to those items of which the prosecutor is aware. It includes all discovery listed below that is in the custody, control,

---

[2] The transcript attached as Exhibit A is a rough transcription of the interrogation of Mr. Bernal. It is not intended as a complete transcription of the proceeding. Mr. Bernal does not "adopt" this transcription. He attaches it solely for the convenience of the Court and maintains his right to contest statements contained in the transcription at a later time.

care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

1. The Defendant's Statements. The government must disclose to Mr. Bernal *all* copies of any written or recorded statements made by her; the substance of any statements made by Mr. Bernal that the government intends to offer in evidence at trial; any response by her to interrogation; the substance of any oral statements that the government intends to introduce at trial and any written summaries of her oral statements contained in the handwritten notes of the government agent; any response to any Miranda warnings that may have been given to her; and any other statements by her. Fed. R. Crim. P. 16(a)(1)(A) and (B). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the government must reveal *all* of Mr. Bernal's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

2. Arrest Reports, Notes and Dispatch Tapes. Mr. Bernal also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding her arrest or any questioning, if such reports have not already been produced *in their entirety*, be turned over to her. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Bernal or any other discoverable material is contained. This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and (B) and Brady v. Maryland, 373 U.S. 83 (1963). See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Bernal are available under Fed. R. Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2 and 12(I). Preservation of rough notes is requested, whether or not the government deems them discoverable.

3. Brady Material. Mr. Bernal requests all documents, statements, agents' reports, and tangible evidence favorable to her on the issue of guilt and/or that affects the credibility of the government's case. Impeachment and exculpatory evidence both fall within Brady's definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

/ / /

4. Any Information That May Result in a Lower Sentence. As discussed above, any information that may result in a more favorable sentence must also be disclosed pursuant to Brady, 373 U.S. 83. The government must disclose any cooperation or attempted cooperation by Mr. Bernal, as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the United States Sentencing Commission Guidelines Manual ("Guidelines"). Also included in this request is any information relevant to a Chapter Three adjustment, a determination of Mr. Bernal's criminal history, or any other application of the Guidelines.

5. The Defendant's Prior Record. Evidence of a prior record is available under Fed. R. Crim. P. 16(a)(1)(D). Mr. Bernal specifically requests a complete copy of any criminal record.

6. Any Proposed 404(b) Evidence. Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate *precisely* the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

This includes any "TECS" records (records of prior border crossings) that the government intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal. Although there is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial. United States v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

Mr. Bernal requests that such notice be given *three weeks before trial* to give the defense time to adequately investigate and prepare for trial.

/ / /

7. Evidence Seized. Evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

8. Request for Preservation of Evidence. The defense specifically requests that all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and that relate to the arrest or the events leading to the arrest in this case be preserved. This request includes, but is not limited to the **vehicle, trailer, and boat involved in the case**, **Mr. Bernal's personal effects, and any evidence seized from Mr. Bernal or any third party**. This request also includes any material or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g. undocumented aliens and transients).

It is requested that the prosecutor be ordered to *question* all the agencies and individuals involved in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to inform those parties to preserve any such evidence.

9. Henthorn Material. Mr. Bernal requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material. See Kyles v. Whitley, 514 U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). This request includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately recommended. Mr. Bernal further requests production of any such information at least *one week* prior to the motion hearing and two weeks prior to trial. If the prosecutor is uncertain whether certain information should be disclosed pursuant to this request, this information should be produced to the Court in advance of the motion hearing and the trial for an *in camera* inspection.

10. Tangible Objects. Mr. Bernal requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers,

documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, that are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to Mr. Bernal. Fed. R. Crim. P. 16(a)(1)(E). Specifically, Mr. Bernal requests **color copies** of all photographs related to this case in the government's possession.

11. Expert Witnesses. Mr. Bernal requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G). This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s). See United States v. W.R. Grace, 493 F.3d 1119 (9th Cir. 2007); United States v. Duvall, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects). This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that he understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with Mr. Bernal or any other witness.

Mr. Bernal requests the notice of expert testimony be provided at a minimum of *three weeks prior to trial* so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing in advance of trial to determine the admissibility of qualifications of any expert. See Kumho v. Carmichael Tire Co., 526 U.S. 137, 119 S. Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

12. Impeachment evidence. Mr. Bernal requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to Mr. Bernal. See Fed. R. Evid. 608, 609 and 613. Such evidence is discoverable under Brady, 373 U.S. 83. See United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

13. Evidence of Criminal Investigation of Any Government Witness. Mr. Bernal requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct. United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

14. Evidence of Bias or Motive to Lie. Mr. Bernal requests any evidence that any prospective government witness is biased or prejudiced against him, or has a motive to falsify or distort his or her testimony. Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Strifler, 851 F.2d 1197.

15. Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity. Mr. Bernal requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic. Strifler, 851 F.2d 1197; Chavis v. North Carolina, 637 F.2d 213, 224 (4th Cir. 1980).

16. Witness Addresses. Mr. Bernal requests the name and last known address of each prospective government witness. See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses). Mr. Bernal also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will *not* be called as a government witness. United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

17. Name of Witnesses Favorable to the Defendant. Mr. Bernal requests the name of any witness who made any arguably favorable statement concerning her or who could not identify him or who was unsure of his identity or participation in the crime charged. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis, 637 F.2d at 223; Jones v. Jago, 575 F.2d 1164,1168 (6th Cir. 1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444 U.S. 1086 (1980).

18. Statements Relevant to the Defense. Mr. Bernal requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert. United States v.

Bailleaux, 685 F.2d 1105 (9th Cir. 1982). This includes grand jury transcripts that are relevant to the defense motion to dismiss the indictment.

19. Jencks Act Material. Mr. Bernal requests production in advance of the motion hearing or trial of all material, including dispatch tapes, that the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitutes Jencks material when an agent reviews notes with the subject of the interview); see also United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999). Advance production will avoid the possibility of delay of the motion hearing or trial to allow Mr. Bernal to investigate the Jencks material. Mr. Bernal requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any Jencks statements during cross-examination.

20. Giglio Information. Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Bernal requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information that could arguably be used for the impeachment of any government witnesses.

21. Agreements Between the Government and Witnesses. Mr. Bernal requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and the government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made or the advice not followed.

22. Informants and Cooperating Witnesses. Mr. Bernal requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in

particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Bernal. The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 52, 61-62 (1957). The government must disclose any information derived from informants that exculpates or tends to exculpate Mr. Bernal.

23. Bias by Informants or Cooperating Witnesses. Mr. Bernal requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio, 405 U.S. 24. Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

24. Personnel Records of Government Officers Involved in the Arrest. Mr. Bernal requests all citizen complaints and other related internal affairs documents involving any of the immigration officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of Mr. Bernal. See Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974). Because of the sensitive nature of these documents, defense counsel will be unable to procure them from any other source.

25. Training of Relevant Law Enforcement Officers. Mr. Bernal requests copies of all written videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement agencies involved in the case (United States Customs Service, Border Patrol, INS, Department of Homeland Security, etc.) to their employees regarding: (a) the handling of vehicles suspected to be transporting contraband across the port of entry; (b) the referral to secondary inspection of persons within those vehicles; (c) the detention of individuals within those vehicles; (d) the search of those vehicles and the occupants of those vehicles, including the proper means of obtaining consent to search and what constitutes consent to search; (e) the informing of suspects of their Constitutional rights; (f) the questioning of suspects and witnesses. Mr. Bernal also requests all written or otherwise attainable information regarding the training of Customs agents at ports of entry in California to detect or discover contraband in vehicles entering the United States, including

/ / /

any training offered to Border Patrol, INS, or officers of Homeland Security Department, by the DEA or other law enforcement agencies or individuals.

26. Performance Goals and Policy Awards. Mr. Bernal requests disclosure of information regarding standards used for measuring, compensating or reprimanding the conduct of all law enforcement officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent such information relates to the detection of contraband. This request specifically includes information concerning performance goals, policy awards, and the standards used by Customs for commending, demoting, or promoting agents for their performance at the port of entry and their success or failure to detect illegal narcotics in general.

27. TECS Reports. Mr. Bernal requests TECs reports. **Mr. Bernal specifically requests any "TECS" records related to him, Mr. Allan Ray West, as well as the truck, boat, and trailer seized in this case. Any prior border crossings are considered "other acts" evidence which the government must produce before trial.** Vega, 188 F.3d at 1154.

28. Reports of Scientific Tests or Examinations. Pursuant to Fed. R. Crim. P. 16(a)(1)(F), Mr. Bernal requests disclosure and the opportunity to inspect, copy, and photograph the results and reports of all tests, examinations, and experiments conducted upon the evidence in this case, including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and that are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

29. Brady Information. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under Brady v. Maryland, 373 U.S. 83 (1963), impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

30. Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions

which would be used to impeach as noted in Fed. R. Crim. P. 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. The defendant requests notice two weeks before trial to give the defense time to investigate and prepare for trial.

31. Residual Request. The defendant intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.

## III.

## MOTION TO SUPPRESS EVIDENCE

The government bears the burden of demonstrating that a defendant's statement is voluntary and that Miranda warnings were given prior to a custodial interrogation. United States v. Harrison, 34 F.3d 886, 890 (9th Cir. 1994); see also United States v. Dickerson, 530 U.S. 428, 439-41 (2000) (discussing constitutional underpinnings of Miranda v. Arizona, 384 U.S. 436, 444 (1966) and the need to safeguard "precious Fifth Amendment rights"); see also 18 U.S.C. § 350. Unless and until the government meets this high burden in this case, Mr. Bernal's statements must be suppressed.

### A. Mr. Bernal's Statements Must Be Suppressed Because He Unequivocally Invoked His Constitutional Right to Remain Silent Numerous Times.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of Mr. Bernal unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966)[3]. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Id. See Orozco v. Texas, 394 U.S. 324, 327 (1969).

Once a person is in custody, Miranda warnings must be given prior to any interrogation. See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980). Those warnings must advise

[3] In Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326 (2000), the Supreme Court held that Miranda rights are no longer merely prophylactic, but are of constitutional dimension. Id. at 2336 ("we conclude that Miranda announced a constitutional rule").

the defendant of each of his or her "critical" rights. United States v. Bland, 908 F.2d 471, 474 (9th Cir.1990). In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading. United States v. San Juan Cruz, 314 F.3d 384, 387 (9th Cir. 2003). The warning must be clear and not susceptible to equivocation. Id. (vacating illegal entry conviction where defendant was advised of his administrative rights from an I-826 form and later advised of his Miranda rights). If a defendant indicates that he wishes to remain silent or requests counsel, the interrogation must cease. Miranda, 384 U.S. at 474; see also Edwards v. Arizona, 451 U.S. 484 (1981). Unless and until the government shows that the agents properly administered the Miranda warnings, the government cannot use evidence obtained as a result of any custodial interrogation that occurred after Mr. Bernal's arrest. Miranda, 384 U.S. at 479.

With regard to the right to remain silent, the Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. The warnings mandated by Miranda are "a prophylactic means of safeguarding Fifth Amendment rights." Doyle v. Ohio, 426 U.S. 610, 617 (1976). They serve to ensure that suspects subject to the inherent coercion of custodial interrogation will not be compelled to incriminate themselves. New York v. Quarles, 467 U.S. 649, 654 (1984). Therefore, "once the government places an individual in custody, that individual has a right to remain silent in the fact of government questioning, regardless of whether Miranda warnings are given." United States v. Velarde-Gomez, 269 F.3d 1023, 1029 (9th Cir. ).

The record reflects that early on during the custodial interrogation, Mr. Bernal invoked his constitutional right to remain silent. See Exhibit A at 5 ("I don't wanna talk no more."). Any statements subsequent to that unequivocal, unambiguous invocation must be suppressed. See Miranda, 384 U.S. at [cite] (a suspect subject to custodial interrogation has the right to remain silent). Quite simply, once Mr. Bernal told Agent Dotson he did not want to speak with him anymore, all questioning should have ceased. See Miranda, 384 U.S. at 473-74 ("If the individual indicates, in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other

than the product of compulsion, subtle or otherwise."), Anderson v. Terhune, 516 F.3d 781, 787-88 (9th Cir. 2007) (en banc) (an invocation is not ambiguous where defendant clearly states his desire to end questioning, for example by saying "I plead the Fifth" and not qualifying the invocation with "maybe" or "might"); United States v. Rodriguez, 518 F.3d 1072 (9th Cir. 2008). In spite of Mr. Bernal's clear invocation, Special Agent continued to try to engage Mr. Bernal by stating, "It starts getting complicated now." Id. In response to Agent Dotson's unlawful further questioning and engagement, Mr. Bernal told him again several times that he did not want to say anything more. See Exhibit A at 5-6 ("You don't want to talk anymore?" "No."; "So you don't want to talk without any attorney[?]" "I really don't."). In the midst of this, Mr. Bernal made statements that the government may try to use against him at trial. Because these statements were made during and after he unequivocally invoked his right to remain silent, they must be suppressed.

**B. Mr. Bernal's Statements Must Be Suppressed Because They Were Involuntary.**

Even in cases—unlike this one—where the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case is deprived of due process of law if the conviction is founded upon an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the burden of proving not only that a confession was made, but also that the confession was voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 483 (1972). In order to be voluntary, a statement must be the product of a rational intellect and free will. Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). A confession is deemed involuntary not only if coerced by physical intimidation, but also if achieved through psychological pressure. "The test is whether the confession was 'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)); accord Malloy v. Hogan, 378 U.S. 1, 8 (1964); and Townsend v. Sain, 372 U.S. 293, 307 (1963).

/ / /

All of Mr. Bernal's statements were the result of coercive tactics and must be suppressed. Throughout the interrogation, Agent Dotson refused to respect Mr. Bernal's right to remain silent, even after he told her multiple times that he did not want to speak with her. She pressured him to keep talking to him. He did this in order to elicit incriminating statements from Mr. Bernal. Officer Dotson's actions and statements render Mr. Bernal's statements involuntary. Accordingly, Mr. Bernal's statements and all evidence resulting therefrom must be suppressed.

**C. Mr. Bernal Requests an Evidentiary Hearing.**

This Court must make a factual determination as to whether a confession was voluntarily given prior to its admission into evidence. 18 U.S.C. § 3501(a). Where a factual determination is required, courts are obligated by Federal Rule of Criminal Procedure 12 to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading. Under section 3501(b), this Court must consider "all the circumstances surrounding the giving of the confession," including:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b) ("section 3501(b)").

Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors and other important factors bearing on voluntariness. Accordingly, Mr. Bernal requests that this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence of the jury, whether any statements made by Mr. Bernal were voluntary.

/ / /

## IV.

## MOTION TO PRESERVE AND RE-WEIGH EVIDENCE

Mr. Bernal requests that this Court issue an order for the U.S. Government and its agents to preserve the narcotic evidence in this case and to permit the defense attorney and his agents to re-weigh it without the packaging. Mr. Bernal also requests the opportunity to view and photograph all physical evidence seized, including his and Mr. West's personal affects, items found in the car, boat, and trailer, as well as the car, boat, and trailer themselves. For the Court's convenience, a proposed order is attached at the end of these motions.

## V.

## COMPEL PRODUCTION OF GRAND JURY TRANSCRIPTS AND DISMISS THE INDICTMENT FOR FAILURE TO PRESENT EXCULPATORY EVIDENCE TO THE GRAND JURY

While it is true that there is no freestanding federal court supervisory authority to require prosecutors to present exculpatory evidence under Williams, see 504 U.S. at 47, where there is legislative mandate to present such evidence, this Court clearly does have authority to dismiss criminal indictments for misconduct relating to a failure to abide by applicable laws. Id. at 46-47 (citation omitted). As noted earlier, Williams rejected the defendant's claim that presentation of exculpatory evidence was required, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

However, federal law requires that prosecutors abide by "State laws and rules," 28 U.S.C. §530B(a). Pursuant to 28 U.S.C. § 530B(a), entitled ethical standards for attorneys for the government, "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal Court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). Prosecutors in this district are generally all members of the California bar, see Southern District of California Local Rule 83.3(c)(3(b) (requiring prosecutors to become members of the California bar). Thus, under California law, subject to the "state laws and rules" set forth by California lawmakers. See 28 U.S.C. § 530(B)(a). Here in California, one need not conjure up any

/ / /

general supervisory authority as the California lawmakers drafted section 939.71 of the California Penal Code which states in pertinent part:

> Exculpatory evidence; duties of prosecutor
>
> If the prosecutor is aware of exculpatory evidence, the prosecutor *shall inform the grand jury* of its nature and existence. Once the prosecutor has informed the grand jury of exculpatory evidence pursuant to this section, the prosecutor shall inform the grand jury of its duties under Section 939.7. If a failure to comply with the provisions of this section results in substantial prejudice, it shall be grounds for dismissal of the portion of the indictment related to that evidence.

Cal. Pen. Code § 939.71(a) (emphasis added). The "shall" language in § 530B(a) makes the California ethical obligation to present exculpatory evidence to a grand jury binding on federal prosecutors at the United States Attorney's Office for the Southern District of California. This Court should compel production of the grand jury transcripts in this case to determine if the government presented the substantial exculpatory evidence relating to Mr. Bernal to the grand jury in this case.[4] If it did not, dismissal is warranted.

In Johnson v. Superior Court of San Joaquin County, 15 Cal.3d 248 (1975), the California Supreme Court interpreted California Penal Code § 939.7, a precursor to the current § 939.71(a), and

---

[4] Mr. Bernal hereby moves this Court to compel the government to produce all grand jury transcripts in this case. See U.S. CONST. AMENDS. V, VI. The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional heritage which was brought to this country with the common law. The Framers, most of them trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual liberty . . . the grand jury continues to function as a barrier to reckless or unfounded charges. 'Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.' Costello v. United States, 350 U.S. 359, 362 (1956). Its historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance." United States v. Manduano, 425 U.S. 564, 571 (1976). In order to ensure that the criminally accused are safeguarded from reckless and unfounded charges, judges must take their duty to provide guidance seriously and not simply pay lip service to the assurances of the government.

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) allows disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Given the arguments raised above, it is clear that "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P 6(e)(3)(E)(ii). Accordingly, because a ground may exist to dismiss the indictment, release of the grand jury transcripts is appropriate in this case.

the obligations it imposed upon prosecutors seeking indictment before a grand jury. The court held that "when a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced." Id. at 254. The state court characterized the grand jury as the "great inquest" between the prosecuting body of government and the citizen; as such, it shall "make accusations only upon sufficient evidence of guilt, and to protect the citizen against unfounded accusation, whether from the government, from partisan passion, or private malice." Id. To infuse the grand jury's power "to protect the citizen against unfounded accusation," the court strictly read a district attorney's obligations pursuant to Cal. Pen. Code § 939.7 as including the duty to "fully and fairly present" evidence to the grand jury. Id. at 255.

In Johnson, petitioner, along with a co-defendant, were arrested for the sale of amphetamine tablets to an undercover narcotics agent. Id. at 251. Before his arrest, however, the petitioner had pled guilty in another drug case and received a beneficial sentencing recommendation from the government on the condition that he cooperate in other drug prosecutions. Id. at 252. The petitioner argued that the district attorney failed to present evidence of this agreement to the grand jury and his testimony at a preliminary hearing that he was in the vicinity of the drug sale to inform on the drug dealer. Id. at 252-53. The magistrate court held that this omission was fatal and dismissed the charges. Id. at 252. Based upon its interpretation of § 939.7, the California Supreme Court agreed with the magistrate's resolution of the conflict.

Here, Mr. Bernal denied participating in the drug smuggling venture. Additionally, the driver of the vehicle indicated at the time of his arrest multiple times that Mr. Bernal did not know and was not involved in the drug smuggling venture. All of this information constitutes material exculpatory evidence. Accordingly, because the prosecutor was aware of this material exculpatory evidence, he should have so informed the grand jury. Failure to do so constitutes a failure to "fully and fairly present" evidence as required pursuant to California Penal Code § 939.71(a) and violates due process resulting in substantial prejudice.

/ / /

# VI.

## THE INDICTMENT MUST BE DISMISSED BECAUSE THE DRUG STATUTES ARE FACIALLY UNCONSTITUTIONAL OR, IN THE ALTERNATIVE, THE INDICTMENT FAILS TO ALLEGE THAT MR. BERNAL WAS AWARE OF THE AMOUNT AND TYPE OF DRUGS

### A. The Statutes Are Unconstitutional.

"[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Nordby, 225 F.3d 1053, 1057-58 (9th Cir. 2000). Clearly, in enacting 21 U.S.C. §§ 841, 952, and 960, Congress intended to do precisely what Apprendi forbids: it made the type and quantity of the controlled substance "a sentencing factor, not an element of the crime under [the statutes]; the statute[s are] not susceptible to a contrary interpretation." Nordby, 225 F.3d at 1058. Because there is no ambiguity, the doctrine of constitutional doubt does not apply. See Miller v. French, 530 U.S. 327, 120 S. Ct. 2246, 2255 (2000).

The statutes are not severable; they contain no default sentencing provisions. Subsection (a) of each provision cannot stand alone: they contain no penalty provisions. See Board of Natural Resources v. Brown, 992 F.2d 937, 948 (9th Cir. 1993) (asking "whether the [a]ct which remains after the unconstitutional provisions are excised is 'fully operative' . . . whether the unconstitutional provisions are 'functionally independent' from the remainder of the [a]ct").

Moreover, this Court may not attempt to uphold the constitutionality of the statutes by attempting to guess what penalties Congress would have imposed if it had known that §§ 841, 952, and 960 were unconstitutional. Indeed, even if it thinks that it may have a good idea of what Congress may have intended when it passed the constitutionally infirm legislation, this Court may not legislate penalties into a statute that lacks them to avoid finding the statute unconstitutional. See United States v. Evans, 333 U.S. 483, 486 (1948). There, the Supreme Court rejected the government's request "to make [the statute] effective by applying . . . one of the possibilities which seems most nearly to accord with the criminal proscription and the terms of the penalizing provision." Id. The Supreme Court refused to "plug the hole in the statute[,]" and concluded that

"[t]his is a task outside the bounds of judicial interpretation. It is better for Congress, and more in accord with its function, to revise the statute than for us to guess at the revision it would make. That task it can do with precision. We could do no more than make speculation law." Id. at 495. If the Supreme Court would not redraft the relatively simple statute in Evans, this Court certainly should not redraft §§ 841, 952, and 960 to include penalty provisions.

The Ninth Circuit went to great lengths to join the other circuits and hold that § 841 (and by analogy §§ 952 and 960) does not violate due process. United States v. Buckland, 277 F.3d 1173 (9th Cir. 2002) (*en banc*). In substance, the Ninth Circuit stated that it, and the other Courts of Appeals, had erred in years of precedent that committed findings of type and quantity of controlled substance to the district court at sentencing or punishment. Buckland, at 1178, n. 2 (citing the various federal circuit courts that had long held that Congress left findings as to type and quantity of controlled substance to the district court at sentencing). Ironically, the Buckland decision turns on what "[§] 841 . . . does not say." Id., at 1179. In other words, the Buckland court construed § 841 (and by analogy would construe §§ 952 and 960) as constitutional because Congress "did not purposefully remove from the jury the assessment of the facts [necessary to] increase the prescribed range of penalties . . . " Id. at 1181 (internal quotation marks and citation omitted). Yet, the Buckland court's conclusion ignores the plain language of § 841(b) (as well as that of § 960(a)), see supra, and the rules of statutory construction that it purports to follow. Buckland, at 1198 (Tashima, J. dissenting). The long awaited Buckland decision makes no sense.

The government will no doubt argue that the Buckland decision binds this Court. Mr. Bernal urges this Court to reject the Buckland decision as an example of result oriented jurisprudence that disregards the definition of due process outlined by the Supreme Court in Apprendi. Apprendi announced a constitutional rule that binds this Court, and this Court must follow it.

**B. If the Statutes Are Constitutional, There Must Be *Mens Rea* as to Type and Quantity.**

If this Court reinterprets the type and quantity of controlled substance to be offense elements, or the "functional equivalent" of offense elements, that have to be alleged in the indictment, this Court must find that the statute's *mens rea* is equally applicable to these new "elements." See

United States v. X-Citement Video, Inc., 513 U.S. 64 (1994). Not only must the indictment allege the type and quantity of "controlled substance" involved in the offense, the indictment must allege that the defendant **knew** the type and quantity involved. And, regardless of what this Court considers the elements of his alleged offense, Mr. Ruben-Flores has a right to a Grand Jury determination on each one. See United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999) ("The Fifth Amendment . . . requires that a defendant be convicted only on charges considered and found by a grand jury."); see also id. (reversing because the Ninth Circuit could "only guess whether the grand jury received evidence of, **and actually passed on**, Du Bo's intent.") (emphasis added).

The Ninth Circuit issued the case of United States v. Carranza, 289 F.3d 634 (9th Cir. 2002), addressing the issue of *mens rea* as to type and quantity of the controlled substance. In Carranza, the Court held that "[a] defendant charged with importing or possessing a drug is not required to know the type and amount of drug." Id. at 644. The fatal flaw, however, with the Carranza analysis regarding *mens rea* is that it relies upon reasoning that has been rejected by Apprendi, Buckland, and Mendoza-Paz. See Buckland, 277 F.3d at 1181 ("Apprendi's reading of the Due Process Clause has stripped the [] holdings [of this Court's previous decisions construing the drug statutes] of precedential value"). For example, the Carranza decision cites the case of United States v. Ramirez-Ramirez, 875 F.2d 772 (9th Cir. 1989), to support its holding that the government need not prove *mens rea* as to drug type and quantity. The problem with reliance on that precedent is that it is based on the premise that 841(b) and 960(b) contain only sentencing factors. Id. at 774 n. 1 ("This interpretation is consistent with both statutes, which require knowing possession of a controlled substance under subsection (a), and refer to different types of controlled substances under subsection (b) for sentencing purposes only."). If, pursuant to the reasoning set forth in Buckland and Mendoza-Paz, sections 841(b) and 960(b) now set forth elements of the offenses, then an entirely different analysis applies because, except for a few narrow exceptions, the traditional rule is that a statute's *mens rea* applies to all elements of the offense. The Carranza decision attempts to avoid this traditional rule.

Thus, assuming that this Court upholds the constitutionality of sections 841 & 960, the grand jury should have found that Mr. Bernal knew the weight and type of substance. Because the grand

jury made no such finding, this Court should dismiss the counts of the indictment pending against Mr. Bernal.

**VII.**

**THIS COURT SHOULD GRANT LEAVE TO FILE FURTHER MOTIONS**

Mr. Bernal and defense counsel have received 65 pages of discovery in this case and two DVDs containing taped statements. Discovery is not yet complete. Defense counsel requests leave to file further motions as new information comes to light.

**VIII.**

**CONCLUSION**

For the reasons stated, Mr. Bernal requests that this Court grant his motions.

Respectfully submitted,

DATED: July 14, 2008

/s/ Erica K. Zunkel
**ERICA K. ZUNKEL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Bernal

# EXHIBIT A

**United States v. Steven Patrick Bernal**
**08cr1894-WQH**
**Partial Transcript of Interrogation**

| | |
|---|---|
| Special Agent Dotson | This is Agent Dotson. The time is 11:20 p.m., May 26, 2008. This is an interview of Steven Bernal. |
| SA Dotson | Do you need a drink of water or anything? Need to take a leak? |
| Steven Patrick Bernal | I'm good. |
| SA Dotson | Alright, my name is Agent Dotson. I'm with Immigration and Customs Enforcement. I am an investigator here at the Port. I'd like to ask you a few questions. |
| SA Dotson | [UI]* State your name as, um, Steven Bernal? |
| Bernal | Mmm hmm. |
| SA Dotson | Where were you born Steven? |
| Bernal | Banning, California. |
| Bernal | What time is it? |
| SA Dotson | It's about 11:20. |
| Bernal | Wow. |
| SA Dotson | How tall are you do you think? |
| Bernal | Like, 5'11, 6. |
| SA Dotson | 5'11. |
| SA Dotson | How much do you weigh? |
| Bernal | Last time I weighed was 205. |
| SA Dotson | 205? |
| SA Dotson | Are you married? Children? |
| Bernal | No. |
| SA Dotson | Any tattoos or anything? |
| Bernal | One. It's like a jester or a clown. It's a two-faced clown. |
| SA Dotson | Nice. |

| | |
|---|---|
| Bernal | Am I going to jail? |
| SA Dotson | [UI] I'm here as an investigator. I go through and talk to the officers here. Look at the vehicle. And I write a report on what happened. So, um. After I get all the reports from everyone, so. But you do understand that right now you're under arrest? [Bernal nods] Okay. |
| Bernal | I've never done anything in my life, dude. The worst I ever done was drunk in public. |
| SA Dotson | So where do you um live now? |
| Bernal | In the reservation. On the reservation. |
| SA Dotson | Oh yeah? |
| Bernal | I have family out there. |
| SA Dotson | Which reservation again? |
| Bernal | Moranga. |
| SA Dotson | Moranga? |
| SA Dotson | What's the address out there? |
| Bernal | 1947, urf... |
| SA Dotson | Does it say on your driver's license? |
| Bernal | No, it's different. |
| SA Dotson | Oh is it? |
| Bernal | That's my grandparents' address. That's the one I went to um, grew up at. I don't remember that. It's in my wallet because I have bad memory. |
| SA Dotson | Your address is 1947, something. [UI] |
| Bernal | 1947 North Mission Road. I believe that's it. |
| SA Dotson | Okay. What's the town out on the rez? |
| Bernal | Banning. |
| SA Dotson | It's up in Banning? |
| Bernal | Yeah. The zip code's... |
| SA Dotson | If memory serves you. |

| | |
|---|---|
| Bernal | The zip code is 922, 92220. |
| SA Dotson | So, what do you do Steven? |
| Bernal | Mainly, I scrap metal. [UI] |
| SA Dotson | Scrap metal. Just sort of general stuff? |
| Bernal | Yeah, just all around. Construction... |
| SA Dotson | Whatever comes your way? |
| Bernal | Yeah. |
| SA Dotson | If you had an emergency, who would you want to call? |
| Bernal | My mom. Her name is Becky. Becky. |
| SA Dotson | Is it with an "I" or with a "Y"? Becky. Probably with a "Y"? |
| Bernal | Y, yeah. Because I'm bad on reading and spelling too. |
| SA Dotson | Becky. What's her phone number then? |
| Bernal | 951-922-9114. |
| SA Dotson | Okay. Does she have an address? |
| Bernal | I don't know it. |
| SA Dotson | Anyone else that you need to call if you can't get a hold of her if something happened to you. |
| Bernal | Um, no. |
| Bernal | [UI] ... in my wallet. Cuz I have phone numbers in my wallet. |
| SA Dotson | Okay. Well before we go over anything else, I want you to know your rights, okay? And then that way we can go forward. Okay? So, I'll give your rights to you.<br><br>Before we ask you any questions, it is my duty to read you your rights, okay? You have the right to remain silent. Do you understand that? [Bernal nods] Everything you say can be used against you in court or other proceedings? Do you understand that? |
| Bernal | Mmm hmm. |

| | |
|---|---|
| SA Dotson | You have the right to consult an attorney before making any statement or answering any of my questions. Kay? You have the right to have an attorney with you during questioning. Kay? If you cannot afford an attorney, one will be appointed for you before any questioning if you wish. If you decide to answer questions now, you still have the right to stop the questioning at any time or stop the questioning for the purpose of consulting an attorney. Do you understand that? [Bernal nods] |
| SA Dotson | Okay, like I told you before, I'm going to write the report based on the reports I get from the inspectors here and from my observations of the vehicle and from testimony, you know, testimony that um Mr. West gave us. So, you can either not answer my questions now and I just put in what I know in the other reports or if you want to talk to me now, then I can include your side into my report. So, if you want to talk to me now, you can talk, or if not, it's up to you. |
| Bernal | [UI] ... I didn't know anything. I really didn't. |
| SA Dotson | Okay, so, let me just waive them to you then.<br><br>Okay, I have had the above statement of my rights read and explained to me and I fully understand these rights, alright? I waive them fully and voluntarily, without threat or intimidation and without any promise, reward, or immunity. I was taken into custody today and I have signed this document at...time is 11:30 p.m. on the 26th. Just print your name ... [UI] ... and sign this. [Bernal signs] |
| SA Dotson | Do you use any drugs, Steven? |
| Bernal | No. |
| SA Dotson | No? |
| SA Dotson | Any alcohol? |
| Bernal | [Bernal nods] |
| SA Dotson | When's the last time you used alcohol? |
| Bernal | Fuck, this morning. |
| SA Dotson | This morning? |
| Bernal | Yeah. |
| SA Dotson | What time did you [UI]? It's 11:30 now. |

| | |
|---|---|
| Bernal | Like around ... it was noon. |
| SA Dotson | So, um, where were you guys coming from today? |
| Bernal | San Felipe. |
| SA Dotson | San Felipe? |
| SA Dotson | How long were you guys down there? |
| Bernal | Just for a day. |
| SA Dotson | Just for the day? |
| SA Dotson | So you guys got down there when? |
| Bernal | Don't know. |
| SA Dotson | So how do you know, um, Allan? |
| Bernal | Just a friend. |
| SA Dotson | Just friends? |
| Bernal | Yeah. I met him like a few months ago. |
| SA Dotson | Yeah? |
| SA Dotson | So what did you guys go do down there? |
| Bernal | Just fish. |
| SA Dotson | Fish? |
| SA Dotson | Did you guys bring your own poles and stuff? |
| Bernal | Nah, I don't know. I don't know. |
| SA Dotson | What were you guys going fishing for? |
| Bernal | I don't know, dude. If I tell you the truth, I could get in trouble. **I don't wanna talk no more.** |
| SA Dotson | **You don't want to talk anymore?** |
| Bernal | **No.** |
| SA Dotson | Okay. It starts getting complicated now. |
| Bernal | I just don't want to go to jail. |

| | |
|---|---|
| SA Dotson | **So you don't want to talk without an attorney. Is that your..?** |
| Bernal | **I really don't.** We didn't come down here to go fishing, we just went to a friend's house and just showed up with the boat. |
| SA Dotson | Did you know there was anything in the boat, though? |
| Bernal | No. He just said we were taking the boat across and I was going to ride passenger. That's all I knew. |
| | *Interview continues...* |

*UI - Unintelligible

**ERICA K. ZUNKEL**
California State Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: erica_zunkel@fd.org

Attorneys for Steven Patrick Bernal

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>STEVEN PATRICK BERNAL,<br>Defendant. | Case No. 08CR1894-WQH-02<br><br>**CERTIFICATE OF SERVICE** |

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her information and belief, and that a copy of the foregoing document has been served this day upon:

U.S. Attorney CR
Efile.dkt.gc2@usdoj.gov; and

Frederick Matthew Carroll
frederickcarroll@hotmail.com,bratty_77@yahoo.com

Respectfully submitted,

DATED: July 14, 2008

/s/ Erica K. Zunkel
**ERICA K. ZUNKEL**
Federal Defenders of San Diego, Inc.
Attorneys for Steven Patrick Bernal